IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

SHEDRICK BROWN,

      Petitioner,

v.                                                    CASE NO. 1:07-cv-32-MP-AK

JAMES MCDONOUGH,

      Respondent.

_____/

## REPORT AND RECOMMENDATION

     This matter is before the Court on Doc. 1, petition for writ of habeas corpus, by Shedrick Brown.  Respondent has filed a response, Docs. 12 & 13, and Petitioner has filed a reply.  Doc. 15.  This cause is therefore in a posture for decision.  Having carefully considered the matter, the Court recommends that the petition be denied.

## BACKGROUND

     Petitioner was charged with sale of cocaine within 1,000 feet of a house of worship and possession of cocaine.  Petitioner waived his right to jury trial and proceeded to a bench trial.

     At trial, undercover officers testified that during a buy/bust operation, they saw Petitioner and a female on the porch of a house.  After making a smoking gesture, the officers were approached by the pair.  When the officer driving the vehicle indicated that he was interested in buying crack cocaine, Petitioner told the officer he had crack on him, and the officer told him he had the money.  Petitioner then showed the officer the crack, but the buy did not occur at that time.  The officer circled the block and again made contact with Petitioner, who "pulled out two

small pieces of what appeared to be crack in his hand."  The officer handed Petitioner twenty

dollars, and Petitioner dropped the crack cocaine into the officer's hand.  The officer who was

the passenger then gave a verbal signal for the takedown team to arrest Petitioner.  Before the

takedown team arrived, the officers asked Petitioner if he had a cell phone or any other way to

contact him, and Petitioner told the officers he did not.  The officers maintained visual contact

with the Petitioner during the entire time between the buy and the arrest, even as Petitioner

walked away.

Both officers identified Petitioner as the seller.  While counsel for Petitioner did not

explore the issue of identification with the officer driving, he asked the other officer how she

was sure Petitioner was the seller, to which she responded: "Well, his smile right there is a good

indicator.  His teeth.  His build.  His hair's a lot shorter than it was."  Doc. 13, Ex. C at 43.

Counsel did not ask either officer to describe the seller's clothing or Petitioner's clothing at the

time of his arrest.  In response to the court's questions, the passenger officer indicated that

although there were other persons on the porches of area houses and there was foot traffic around

the house where Petitioner was first spotted, when he stepped off the porch, "he walked away

from all that foot traffic."  *Id*. at 48.

A third officer, who was part of the takedown team, testified that the person identified for

arrest was wearing a white t-shirt and blue jeans.  Though the arrest team identified the seller

primarily by his clothing, that clothing was not taken into evidence or brought to trial.  The

officer was certain, however, that the person arrested was wearing a white t-shirt, jeans, and a

hat.  *Id*. at 55-56.  A fourth officer, also part of the takedown team, agreed that the person

described by the undercover officers as the seller was identified by a clothing description, but

when the team "got on top of him, [the undercover officers] said on the radio, That's him.  That's

him." *Id*. at 60.  In response to the court's questions, the officer clarified that he did not mean "physically on top of him," but instead "[w]hen the vehicle was right next to the suspect walking down the road." *Id*. at 62.  He also testified that the nearest person to the suspect was approximately thirty feet away and that the suspect was the only pedestrian he saw.  *Id*.

A fifth officer, who was in a second takedown vehicle, saw the suspect drop something from his hand onto the ground, which was later identified as the twenty dollar bill used in the crack buy.

When the State moved to introduce the videotape of the drug buy, defense counsel stated that if the State could lay the proper predicate for the introduction, he would have no objection. *Id*. at 78-79.  The State withdrew its motion and rested without introducing the tape.  *Id*.

The court denied Petitioner's motion for judgment of acquittal, which was predicated on there being a dispute in the record about the events of the evening, and after a short recess, counsel for Petitioner asked to "place on the record that after discussion with Mr. Brown, Mr. Brown has elected not to take the stand on his own behalf." *Id*. at 79-80.  Counsel further advised the court that he and Petitioner "had discussed whether or not the defense was going to present the videotape into evidence." *Id*. at 81.  According to counsel, he had told Petitioner that "it was not my intention to do so.  I did not think that it would be particularly advantageous." *Id*. Counsel then rested and renewed his motion for judgment of acquittal, as the State had "failed to provide the Court with sufficient and competent evidence with which the Court may make a finding of guilty." *Id*.

Petitioner was sworn in, and he and the court entered into the following exchange:

THE COURT:          You heard Mr. McLennon say that he's discussed with you
                    whether you wish to testify or not?

THE DEFENDANT:  Yes, sir.

THE COURT:              Have you had that conversation with him?

THE DEFENDANT:   Yes.

THE COURT:              Have you talked about it before today as well?

THE DEFENDANT:   Yes.

THE COURT:              You understand that you have the right to testify and if you
                                do so you'll be placed under oath and questioned by your
                                lawyer and cross-questioned by the prosecuting attorney
                                and I may have questions as well?

THE DEFENDANT:   Yes, sir.

                                                * * *

THE COURT:              If you do that, I will consider and weight your testimony
                                and evidence as any other witness; do you understand?

THE DEFENDANT:   Yes, sir.

THE COURT:              You also have the right not to testify and if you choose not
                                to testify, I cannot consider the fact that you did not testify
                                in any way.  I can't infer from that that you might be guilty
                                or you must have done something wrong; do you
                                understand that?

THE DEFENDANT:   Yes.

                                                * * *

THE COURT:              With that understanding, what have you decided to do?

THE DEFENDANT:   Not to testify, sir.

THE COURT:              And that's your decision?

THE DEFENDANT:   Yes.

THE COURT:              All right.  That is your right.

                                Are you in all respects as you stand here today, your lawyer

is not presenting any witnesses, not presenting any
evidence at all, are you at this time satisfied with the advice
and representation that you've received from Mr.
McLennon?

THE DEFENDANT:  Yes.

THE COURT:        You agree with the decision not to call witnesses or present
with any evidence?

THE DEFENDANT:  Yes.

THE COURT:        And are you completely satisfied with his advice and
representation?

THE DEFENDANT:  Yes.

*Id.* at 81-83.

The court denied the motion for judgment of acquittal and then heard oral argument.

Counsel for Petitioner pointed out (1) that there were a number of buys on the night in question,

(2) that there was a dispute as to whether Petitioner was walking or running at the time of his

arrest, (3) that the officers could be confused "as to which case they're trying to recall now," (4)

that there was a dispute as to whether Petitioner had anything in his hands, (5) that there was a

dispute as to whether only one of the undercover officers handled the crack cocaine or whether

both touched it, (6) that the measurement from the point of the buy to the church was unreliable,

as it was taken six months after the fact and the buy location was based on the officer's memory,

(7) that the actual buy money should have been placed into evidence, as opposed to a photocopy

of it, and (8) that Petitioner was identified as the seller by his clothing, which was not put into

evidence.  In sum, "[T]aken in its entirety, in the context, I think there's sufficient confusion

about what all went on to indicate enough reasonable doubt for the Court to find Mr. Brown not

guilty of this charge, particularly as to the question of measurement, in other words, within a

thousand feet of a church." *Id*. at 88.

The court found Petitioner guilty on both counts. While it acknowledged there were

some discrepancies in the testimony, the court found none of them to be significant or to raise a

reasonable doubt. *Id*. at 89.

The court immediately proceeded to sentencing. The State sought to habitualize

Petitioner, who had a lengthy criminal record, and in response to the court's questions regarding

"what [Petitioner's] life has been like," and when he had last been incarcerated, Petitioner stated:

> I went for possession of cocaine and violation of probation. That's it, sir. And I
> wasn't with nobody. He talking about a lady. I wasn't with no lady that night
> when they talking about I sold cocaine. I did not have on no blue jeans neither,
> sir. The only thing they get off me was a stem. Sir, I use drugs. I don't sell
> drugs.

*Id*. at 96.

In response, the court reminded Petitioner that he had the "opportunity to testify

and...didn't do it" but asked him if he wanted "to testify now and tell me what happened?"

Petitioner explained:

> Sir, I do not...sell drugs. I use drugs. When they arrested me they got a stem off
> of me, a pipe, a smoking pipe. I do not sell drugs. I didn't...sell any drugs. And I
> didn't have on blue jeans. My pants I wore is this color and they still at the
> jailhouse when she arrested me. I did not have on no blue jeans and white T-shirt.
> My clothes is in property, when they took me to jail. It's still at the jailhouse
> right now. So they got t have the wrong person, sir, because I'm a user. And the
> money they got off me they give back my money when they took me to jail. And
> I wasn't on...nobody porch. I don't even know nobody over in that area....I went
> over there to buy me some drugs, get me some drugs to smoke. I did not have any
> drugs and I didn't sell anybody no drugs. When they took me down to the police
> station, I told them that I use drugs. They know they took a stem off of me, a pipe
> off of me. That's all they got off of me, sir, and the money I had in my pocket of
> my own.

* * *

> [T]hat's all.  I just let [you] know, sir, I'm getting sentenced but I'm not the one who sold no drugs.  And the clothes I had on, it ain't no blue jeans.  And I sent you a letter showing you...I couldn't have been on the porch and I couldn't have been in the streets at the same time.

*Id*. at 96-97.

The court responded:

> Mr. Brown...it's interesting to me that you're now telling me your version of this, which I cannot now consider in deciding whether you're guilty or innocent because I've already decided taht you've been proven guilty beyond a reasonable doubt.
>
> And the evidence uncontradicted was that you're the man who made the transaction with the undercover police officers, that the officers kept you in view, either Officer Noland by looking through the back of the window and Officer...Okegbola in using the mirrors watched you until the officers arrived.  The officers made the arrest.  One officer saw you drop what was recovered as a $20 bill.  He compared the serial number and it matched with the serial numbers issued to Officer Okegbola.
>
> Based upon the fact evidence and there being nothing in the record to suggest otherwise, it was clear and convincing to me, and I certainly found proof beyond a reasonable doubt that you were guilty of the offenses with which you are charged.

*Id*. at 97-98.  The court declined, however, to habitualize Petitioner's sentence and sentenced him to 94.65 months, with credit for time served.  *Id*. at 98-99.

Petitioner appealed, asserting that the State did not present competent evidence that any money changed hands during the alleged drug transaction, and, thus, it failed to prove the requisite elements of the offense of sale of cocaine.  Doc. 13, Ex. D. More specifically, he argued that the photocopy of the twenty dollar bill used in the transaction did not constitute competent and relevant evidence and that the State should have introduced the actual twenty dollar bill used

by the police officer in the transaction. *Id*.

The court of appeal affirmed per curiam without written opinion. Doc. 13, Ex. G.

Petitioner then filed a Rule 3.850 motion for post-conviction relief. In his motion Petitioner raised three claims: (1) whether counsel was ineffective for failing to present exculpatory evidence at trial, (2) whether counsel was ineffective for improperly influencing Petitioner not to testify, and (3) whether counsel was ineffective for failing to object to the court's conduct which showed a lack of impartiality. Doc. 13, Ex. I.

The court denied the motion as to third claim, appointed Petitioner counsel, and set the remaining claims for evidentiary hearing. At the evidentiary hearing, Petitioner's counsel broke the first claim regarding counsel's failure to present exculpatory evidence into two issues: (1) that counsel improperly failed to present the videotape into evidence, and (2) that counsel failed to present the clothing that Petitioner was wearing at the time of his arrest. Doc. 13, Ex. O. Counsel also advised the court that both the clothing and the videotape had been destroyed or disposed of in some manner and were not available for inspection or review. *Id*.

Petitioner testified first. At that time, he advised the court that at the time of his arrest, he was wearing a black and white checkered hat," an Atlanta Braves jersey "with the axe on the front of it," and "gray slacks with creases in the front." *Id*. According to Petitioner, before trial, he explained to trial counsel that "he can go up in the property room at the jailhouse, my clothes, what they brought me to jail in, was up there in the property room." *Id*. He acknowledged that during trial he did not further discuss the issue with counsel but explained:

> No, I didn't really get to ask him. What I had...asked him about before we went
> to trial really is showing the tape showing I did not sell any drugs and me and him
> sat down and watched the tape.

Well, I had told him about the clothes when he came to spoke to me, he can go in the property room at the jailhouse and look at the clothes and he'll see I wasn't wearing a white t-shirt and blue jeans, I was wearing a Braves jersey and gray slacks and a black and white checkered hat.

*Id*.  Petitioner further testified that the videotape only showed him one time:

[I]t showed me with my hands in the air telling him–he was asking me did I have a phone.  I telling him I don't have no phone and I don't sell no drugs because he had came and approached me.  The cop approached me.  One time I told him I don't stay on this side, go ask somebody else.  But they was asking me did I know where they can buy a dime rock.  I told him I don't stay on this side, go ask somebody.  But the only time I showed me on the film is when they asked me do I have a phone that they could get–if they want something, they can get in touch with me.  That's the only time it showed me on the film.

*Id*.

In Petitioner's opinion, the videotape "would have helped" his defense:

It would have freed me because at the time when me and him sat down and watched that tape, you see a woman at the car.  We sat down, we ran it back and we looked at the people who was at the police car and we listened to the voice, too, as they talking and I ain't in neither one of them.  It's just all women and the police talking.

*Id*.  Though he "mentioned to [counsel] about having the video showed at trial," he did not say anything at trial when counsel did not offer the videotape into evidence "because I figured he know."  *Id*.  In response to the court's questions, Petitioner testified that the only time his voice was on the video was when he had his hands in the air and was telling the undercover officers that he did not have a phone and that he did not sell drugs.  *Id*.

As to the claim regarding counsel's advice regarding testifying in his own behalf, Petitioner stated:

Well, my understanding was if I get up and testify, get on the stand, that they can bring back up all my back history against me, bring it up in the court, so it would be best, you know, not for me to testify and list all my–didn't bring all what

happened–what I did in the back, bring it up in this here.

*Id.*  If he had known that his criminal history would not have been presented, he would have testified at trial: "I would have told the trial judge I'm not a–I wasn't selling dope there.  I went to purchase dope for myself.  I was smoking dope."  *Id.*

Petitioner's trial counsel, Thomas J. McLennon, testified next.  McLennon explained that at the time of Petitioner's trial, he had been handling felony criminal cases in the public defender's office for only about six months.  *Id.*  According to McLennon, Petitioner's own "original theory" was that

> although he had physically placed two rocks of cocaine in the officer's hand, he did not physically touch the money that was handed through the window and his feeling was that because he did not touch the money, a sale was not completed and the State could not prove a sale of cocaine charge.

*Id.*  McLennon stated he told Petitioner that "in my professional opinion, the State did not have to prove that he physically touched the money" and that "the State might very well convince the jury that he did touch it."  *Id.*

When Petitioner received a copy of the State's discovery, "he did find a discrepancy in the description of his clothing...and we discussed that at length."  *Id.*  According to counsel, "I told him that in my opinion that were we to make an issue of this at trial, there were a couple of problems with it":

> One, I believe that the State would argue that the description of the clothing entered into the report by the officer would have been made later in the day and that that would not necessarily prove that that was the description of the clothing that the officer gave to his fellow officers.
>
> I also explained to Mr. Brown that there was a problem in that the...undercover officer was going to testify that he had Mr. Brown in continual observation between the moment that the cocaine was placed in the officer's hand and the moment that the backup officers took Mr. Brown into custody, and indeed he did

testify so at trial.

> But I explained to Mr. Brown that if we were to make an issue of the clothing, not only would the State argue that it was a clerical error on the part of the officer, but would also seek to convince a jury that I was up to some cheap and shoddy lawyer's trick and I told him in my opinion that this would not bode well for our chances at trial.

*Id.*

As to the videotape, McLennon acknowledged that he viewed it with Petitioner, and that based on his memory, there was a point in the tape clearly showing a "person, and Mr. Brown told me it was him, standing at the window of the car."  *Id.*  According to counsel,

> Mr. Brown's take on the tape was that it did not clearly show his face and a person who is seeing the tape for the first time would have difficulty telling who exactly it was and then identify a person from the tape.  However, the actions of the person on the tape were just visible enough so that it would have been consistent with what the officer said happened regarding the transaction.  There was a woman who appeared at the window, the woman went away, the man remained.

*Id.*  To counsel, "about the only theory I could have developed [at trial] was that the State would not have been able to present sufficient evidence to bring...the judge in this case to a finding of guilt beyond a reasonable doubt."  *Id.*  McLennon opined that Petitioner "never did give me a defense that in my professional opinion was workable, neither the clothing nor his insistence, because he did not touch the currency, that a sale was not completed."  *Id.*  In short, counsel "was severely limited in what [he] could do."  *Id.*

With regard to whether Petitioner should testify, McLennon stated that they discussed the issue "a number of times."  *Id.*  He then explained his standard advice to clients with prior convictions who want to testify regarding how they should answer questions about those convictions.  *Id.*

According to counsel, his notes reflected that the judge stated off the record "that he was certain–the judge didn't explain why he was certain, but Judge Turner was certain that Mr. Brown was not wearing blue jeans, but it made no difference to him." *Id.*

On cross-examination, McLennon was asked why, "if [he] didn't have much to go on," he did not point out the discrepancy between "what the police described the offender wearing and what your client was actually wearing at the time that the offense occurred...." *Id.* McLennon responded:

> I did enter the pros and cons to weighing the clothing into evidence, but certainly that Mr. Brown wanted a bench trial and the bench trial was going to be in front of Judge Turner, I weighed the pros and cons of trying to introduce this knowing that the officer was going to testify that he had Mr. Brown in continual observation, having a pretty good idea if the State would explain the discrepancy as I described before and my fear was that this move would anger Judge Turner to the detriment of Mr. Brown. In other words, I believe that Judge Turner would find this to be implausible.

*Id.* Counsel did not ever go to the police station and look at the clothing because he was "satisfied that they were as [Petitioner] described them." *Id.* When Petitioner's post-conviction counsel asked McLennon why the court would have been angered by introducing evidence that Petitioner "was not wearing the clothing that the officers described...the offender as wearing," McLennon stated: "Well, perhaps anger might be the wrong word. Irritate or provoke him possibly. It is my belief that he would have discounted it, he would have considered Mr. Brown to be untruthful." *Id.* Post-conviction counsel then pressed McLennon to explain "in what way would Mr. Brown be untruthful if he truthfully represented what he was wearing at the time of the offense[.]" McLennon responded:

> I don't think he would have been considered untruthful...about what he was wearing....I think certainly if I was to introduce the clothing, it could only have

been in an effort to prove that the officers arrested the wrong man.  I did not think
it would work.

*Id*.  In response, post-conviction counsel asked, "But wouldn't that be the only defense you
would have in this situation, that they arrested the wrong guy?"  *Id*.  McLennon answered, "I
certainly could not represent to the Court that they arrested the wrong guy," because Petitioner
"had already told [me] that he did in fact put the cocaine in the officer's hands."  *Id*.  When post-
conviction counsel suggested that the role of a defense attorney included presenting "the
possibility that they had...arrested the wrong guy," even without "affirmatively stat[ing] to the
Court that they arrested the wrong man," McLennon presented "another consideration for not
introducing it," namely, that he "would have lost the final argument."  *Id*.  In McLennon's
opinion, "having the final argument would be more useful than frankly trying to snow the Court
with his clothing."  *Id*.

     With regard to the videotape, McLennon stated that there was "nothing on the videotape
that would have been useful to the defense," as it was poorly made: "[I]t would not show a
person who was obviously Mr. Brown, but it would not show a person who was obviously not
Mr. Brown.  It would not have gained the defense anything and again would have cost the
defense the final argument."  *Id*.  According to counsel, he "somewhat expected [the State] to
enter it into evidence" and recalled "thinking that it was helpful to the defense that it was not
introduced by the State."  *Id*.

     Subsequently, the court denied the remaining grounds for relief, stating that based on
Petitioner's statements to the court during trial and testimony from him and his attorney at the
evidentiary hearing,

> the Court accepts Mr. McLennon's testimony that after reviewing all the evidence
> in the case, Defendant agreed to counsel's decision to not present any evidence.
> The Court also accepts Mr. McLennon's testimony that he properly advised
> Defendant regarding his criminal history that would come out at trial if he
> testified.

Doc. 13, Ex. N.

Petitioner, through counsel, appealed, raising two issues: (1) whether the court erred in

denying his claim that counsel was ineffective for failing to present exculpatory evidence,

namely, his clothing and the videotape, and (2) whether the court erred in summarily denying his

claim that the trial court failed to remain impartial.  Doc. 13, Ex. R.  He did not appeal the issue

regarding his failure to testify.  The court of appeal affirmed without written opinion.  Doc. 13,

Ex. T.

The instant petition followed.  On this occasion, Petitioner raises two issues: (1) whether

counsel was ineffective in failing to present exculpatory evidence, and (2) whether counsel was

ineffective when he "improperly advised the Petitioner to waive his right to testify at his trial by

judge."  Doc. 1.  Each ground will be considered in turn.

## DISCUSSION

Under 28 U.S.C. § 2254, a federal court may grant habeas corpus relief only if the state

court adjudication

> (1)      resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of
> the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the "contrary to" clause of § 2254(d), "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "A state-court decision will certainly be contrary to...clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams*, 529 U.S. at 405. A state-court decision will also be contrary to clearly established Supreme Court precedent "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent." *Id*. at 406.

Under the "unreasonable application" clause of § 2254(d), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. The federal court considering a habeas petition "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 412.

Settled circuit court precedent interpreting Supreme Court decisions is not determinative of clearly established federal law.  Instead, this Court must look to the specific holdings of Supreme Court cases themselves.  If the Supreme Court has not issued a specific holding on the issue at hand, then the state court's decision is not contrary to or an unreasonable application of clearly established federal law.  *Carey v. Musladin*, ____ U.S. ____, 127 S.Ct. 649, 654, 166 L.Ed. 2d 482 (2006).

Further, in reviewing the decision of the state court, this Court must presume that the state court's factual determinations are correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001).

The fact that the appellate court does not write "an opinion that explains the state court's rationale," does not detract from the deference owed to that court's decision.  *Wright v. Secretary for the Department of Corrections*, 278 F.3d 1245,1255 (11th Cir. 2002).  Under § 2254, the Court is to focus on the result of the state proceeding, not the reasoning underlying it, since all that is required for a state-court adjudication on the merits is a rejection of a claim on the merits, not an explanation.  *Id*. at 1254-55.

Furthermore, a habeas petition grounded on issues of state law provides no basis for habeas relief, as a violation of a state statute or rule of procedure is not, in itself, a violation of the federal constitution.  *Engle v. Isaac*, 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982); *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1989).  This limitation on federal habeas review applies equally when a petition which truly involves only state law issues is couched in terms of alleged constitutional violations.  *Branan*, 861 F.2d at 1508; *see also*

*Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3rd Cir. 1997) (errors of state law cannot be repackaged as federal errors simply by citing the United States Constitution).

Section 2254 relief will not be granted unless Petitioner "has exhausted the remedies available in the courts of the State" or "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1)(A) and (B).  A claim is not exhausted if Petitioner "has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).  To fully exhaust state remedies, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In addition, "the federal claim must be fairly presented to the state courts," and it must be "the same claim."  *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *see also Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard*).

Claims which have not been fairly presented to the state court but are defaulted from state court review are considered technically exhausted because no remedies are available for purposes of § 2254(c).  *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).  *See also White v. State*, 664 So.2d 242, 244 (Fla. 1995) (claims that could have or should have been raised on post-conviction and were not so raised are procedurally defaulted).  However,

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750.  A respondent's failure to raise exhaustion does not constitute

a waiver, since "[a] State shall not be deemed to have waived the exhaustion requirement

or be estopped from reliance upon the requirement unless the State, through counsel,

expressly waives the requirement."  28 U.S.C. § 2254(b)(3);  *McNair v. Campbell*, 416

F.3d 1291, 1304 (11th Cir. 2005); *Dill v. Holt,* 371 F.3d 1301, 1302 n.1 (11th Cir. 2004).

Because Petitioner's claims raise the issue of counsel's effectiveness, a review of

*Strickland v. Washington*, 466 U.S. 668 (1984), is appropriate.

To prevail on a constitutional claim of ineffective assistance of counsel, a

defendant must demonstrate (1) that his counsel's performance was below an objective

and reasonable professional norm, and (2) that he was prejudiced by this inadequacy.

*Strickland*, 466 U.S. at 686.  The court may dispose of the claim if a defendant fails to

carry his burden of proof on either the performance or the prejudice prong.  *Id*. at 697.

The court need not address the adequacy of counsel's performance when a defendant fails

to make a sufficient showing of prejudice.  *Id.; see also Tafero v. Wainright*, 796 F.2d

1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide

factual support for his contentions that counsel's performance was constitutionally

deficient.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).  The court must

consider counsel's performance in light of all of the circumstances at that time and

indulge in a strong presumption that counsel's conduct fell within the wide range of

reasonably professional assistance.  *Strickland*, 466 U.S. at 689-90.  To show counsel's

performance was unreasonable, a defendant must establish that "no competent counsel

would have taken the action that his counsel did take." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted).  This standard is objective, and "it matters not whether the challenged actions of counsel were the product of a deliberate strategy or mere oversight." *Gordon v. United States*, 496 F.3d 1270, 1281 (11th Cir. 2007).  "The relevant question is not what actually motivated counsel, but what reasonable could have motivated counsel." *Id*.  When the court "can conceive of a reasonable motivation for counsel's actions," it can deny the claim of ineffectiveness without evidentiary hearing. *Id*.  "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption...that [counsel] did what he should have done and that he exercised reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001).

"The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).  There are no "absolute rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions." *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).  "To uphold a lawyer's strategy, [the Court] need not attempt to divine the layer's mental processes underlying the strategy." *Chandler*, 218 F.3d at 1315 n.16.  "No lawyer can be expected to have considered all of the ways [to provide effective assistance]." *Id*.  Quite importantly,

If a defense lawyer pursued course A, it is immaterial that some other

reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And [the Court's] inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id.*

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id*. Additionally, prejudice is established only with a showing that the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail...are few and far between." *Chandler*, 218 F.3d at 1313 (11th Cir. 2000). This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether a reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

1.      Failure of counsel to present exculpatory evidence.

In this claim, Petitioner charges that counsel was ineffective for failing to present either his clothing or the videotape at trial. As noted, the state court made a factual

finding that Petitioner agreed with that strategy based in part on Petitioner's statements to

the court at trial that he was satisfied with his attorney's decision not to present any

evidence.  This finding is presumed correct unless Petitioner can rebut the presumption of

correctness by clear and convincing evidence.

Having carefully considered the matter, the Court finds that this factual finding is

entitled to a presumption of correctness, and as it is plainly supported in the record,

Petitioner cannot overcome the finding.  While the state court did not discuss *Strickland*

but based its decision strictly on the factual determination noted, this Court would note

that Petitioner has not shown that counsel's performance was deficient in failing to

present the allegedly exculpatory evidence.  Counsel testified that Petitioner told him that

he placed the crack cocaine in the officer's hands during the buy/bust operation, and that

in his opinion, neither the videotape nor the discrepancy in the clothing was helpful to the

defense in light of Petitioner's admission to him.  The videotape was of poor quality and

the discrepancy was easily explainable as a clerical error.  Thus, even if counsel had

presented both the videotape and the clothing, there is not a reasonable probability that

the court would have found these pieces of evidence sufficiently persuasive to raise a

reasonable doubt as to Petitioner's guilt in light of the officers' unequivocal testimony

that they maintained visual contact with Petitioner from the time he placed the crack in

the officer's hands to the time he was arrested by the takedown team.  This claim is

therefore without merit.

2.      Improper advice regarding whether Petitioner should testify.

In his second claim for relief, Petitioner charges that counsel was ineffective

when he "improperly advised the Petitioner to waive his right to testify at his trial by judge."  Though this claim was raised on post-conviction and was one of the subjects of the evidentiary hearing, Petitioner did not appeal the court's ruling on this claim.  The claim is therefore unexhausted, and Petitioner has not shown grounds sufficient to excuse the failure to exhaust.

Be that as it may, the claim is without merit.  As noted, the state court made a factual determination that counsel properly advised Petitioner as to his right to testify and the scope of cross-examination regarding his criminal history if he had taken the stand. Petitioner has not overcome the presumption of correction afforded that conclusion. Furthermore, because counsel did not improperly advise Petitioner in these matters, he cannot be deemed to have acted deficiently under *Strickland*.  The claim is therefore not only unexhausted but also without merit.

## CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that the petition for writ of habeas corpus, Doc. 1, be **DENIED**, and this cause be **DISMISSED WITH PREJUDICE**.

**IN CHAMBERS** at Gainesville, Florida, this 31st____ day of March, 2008.


S/A. Kornblum
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**